NO. 07-01-0072-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL A

SEPTEMBER 28, 2001

_____


IN THE MATTER OF THE MARRIAGE OF MELINDA MORRIS
ELLSWORTH AND JOHN ROBERT ELLSWORTH AND IN
THE INTEREST OF A MINOR CHILD


_____

FROM THE COUNTY COURT AT LAW NO. 2 OF LUBBOCK COUNTY;

NO. 99-507,510; HONORABLE WILLIAM R. SHAVER, JUDGE

_____

Before BOYD, C.J., and REAVIS and JOHNSON, JJ.

In this appeal, appellant Melinda Morris Ellsworth challenges the validity of a settlement agreement dividing the community property of the parties at the time the marriage was dissolved. In mounting her challenge, and in two issues, appellant argues the trial judge abused his discretion when he denied her motion for new trial because 1) she withdrew her consent to the agreement before final judgment was entered; and 2) she was induced to enter into the settlement agreement by misrepresentations on the part of

her spouse as to the value of the divided property. Those misrepresentations amounted to extrinsic fraud entitling her to a new hearing on property division. For reasons we later recount, we affirm the judgment of the trial court.

The initial issue before us is whether the statements made by the trial court immediately after the settlement agreement had been dictated constituted a rendition of judgment. If it did, the revocation of consent to the agreed judgment came too late. If it did not, the revocation of consent before the court signed its written judgment negated that judgment.

The record reveals that on November 20, 2000, the trial of the divorce suit between the parties had begun. After the noon recess, the trial judge made an initial announcement that he had been notified that the parties had arrived at an agreement and "want the agreement set out here fully here for me to approve on the record. So let's take your time and set it out." The judge then noted that appellant was not present and stated he would not proceed until she was, because "I am going to ask both parties if they agree to this agreement." Appellant then appeared, and appellee was put on the stand to establish the jurisdictional requisites for a divorce. After that was done, appellee was interrogated extensively about the details of the property settlement in the course of which, he opined, that it was a just and fair division of the property. Appellant then took the stand and, in answer to questions propounded by her counsel, acknowledged that she had heard the

2

agreed provisions of the settlement, that they were correct, and that it was a fair and just division. She also acknowledged that she was satisfied with her attorney's representation.

The trial judge then announced that he "will grant the divorce," and that he "will approve" the settlement. Because of its materiality, we will set out the court's response to appellee's counsel's request that the judge "announce the granting of the divorce." It is as follows:

> The Court: Well, the court has granted the divorce. And will order — which one of you can have this judgment prepared by 9:30 in the morning?
>
> Appellant's Counsel: I believe Mr. Fouts [appellee's lawyer] can do that.
>
> The Court: All right. I want both attorneys here at 9:30. Now, when I say I want the judgment here in the morning, that doesn't mean that I am giving it to you to go ahead and negotiate again. In other words, I want this judgment here in the morning. The divorce has been granted. I have approved the property settlement agreement. I want it reduced to writing and presented to the Court at 9:30 in the morning. Both lawyers be here. All right.
>
> Appellee's Counsel: And we will have the parties to approve it.
>
> The Court: Well, I want to make this plain, too. In other words, I have granted the divorce. I have approved the settlement. I really don't care whether the parties approve it or not. I have gone ahead – if you can go ahead and get them to sign it, sign it. If they don't, this is the judgment I have granted. This is the one I am going to enter in the morning. Do both of you understand?
>
> Appellant's Counsel: Yes, sir.
>
> Appellee's Counsel: Yes, sir.
>
> The Court: All right. That's the order of the Court. Be back here in the morning.

At the hearing on the motion for new trial, appellant testified that her son[1] did not want her to have the divorce hearing on November 20, which was his birthday. According to her, he had been having nightmares and had been wetting the bed. On the Saturday just prior to the Monday hearing, the boy told her at her father's place that he did not want to live anymore and just wanted to die. Her son had been having visitation with his natural father and after the most recent visits, his personality changed and he began having trouble at school. In the three-week period before the trial, appellant had been having conferences with school administrators, teachers and counselors about her son's behavior. Appellant averred that she had asked her trial attorney to get a continuance because she did not think she was emotionally able to go through the hearing. However, her attorney advised her that she did not think her son's problems would be enough to get a continuance because he was not appellee's son. Appellant also averred that her attorney told her that if she settled, she had 30 days "to come back."

Appellant further testified that her father had been taking her son's suicide threats seriously. Indeed, that threat had affected him physically because he recently had a double bypass heart operation. The day of the trial, he had awakened with heart pains. Her father was supposed to be a witness for her but, she said, he would not have been able to do so because of that condition. However, she testified, he was allowed to be present at the hearing because "if he came to the courthouse, at least if he had a heart

---

[1]This was not the son born to appellant and appellee.

4

attack, we could watch him." Even so, when asked by her attorney if she was not competent to make the decision to settle the case, she denied that she was incompetent.

Under the settlement agreement, she was to receive a Corsica automobile which, she said, appellant had represented to her was in good condition. However, when she picked it up after the divorce hearing, she testified that it was leaking oil and smoking and the inside smelled like urine. She also said that appellee represented to her that the Corsica was worth $7,000, but when she took it to a car dealership, they told her they would allow her $2,000 on a trade-in, but that it was not worth $1,000 on the street and was not in good running order.

Because of this, appellant said, when she arrived at the courthouse on November 21, the morning after the hearing, she told her attorney and appellee's attorney that she was not going to sign the papers and that she had changed her mind. Her trial attorney told her, "[t]oo bad. You settled, and there is no going back."

Appellant's father testified at the new trial hearing that on November 20, after the divorce hearing, he took appellant to pick up the Corsica. She drove the car a block, stopped it and told her father "[t]hat this don't have no brakes on it" and that she had to pump the brakes "to get brakes on it." He also said that the car was smoking, but "I don't know if it was just flooded down or burning oil." In her brief, appellant also points out that, in appellee's original inventory and appraisement, he failed to mention the Corsica but,

5

subsequent to the judgment, appellee filed an amended inventory showing the value of the Corsica at $5,225.

Appellee testified at the new trial hearing that he bought the car for $4,250 and when he called "the bank," he was told the value of a Corsica with a four cylinder engine was $6,300. Because the Corsica with which we are concerned had a six cylinder engine, he said he told appellant "it may be even more valuable than $6,300; it could be worth $7,000, but I didn't know because I didn't have a book. That's what I said." He admitted he told appellant the car was in good working order and averred he had it inspected to make sure it was in good working order.

A party may revoke his consent to settle a case anytime before judgment is rendered. *Samples Exterminators v. Samples*, 640 S.W.2d 873, 874-75 (Tex. 1982). Judgment is rendered when a court makes an official announcement either in writing or orally in open court clearly stating its decision upon a matter submitted for adjudication. *James v. Hubbard*, 21 S.W.3d 558, 561 (Tex.App.–San Antonio 2000, no pet.). Thus, once a judgment is orally pronounced, the entry of a written judgment is purely a ministerial act. *Id.; Dunn v. Dunn*, 439 S.W.2d 830, 832-33 (Tex. 1969). Even so, in order to be the official judgment, the language of the trial judge during the oral pronouncement must indicate an intent to render a full, final, and complete judgment disposing of all the issues present for adjudication at that point in time. *S & A Restaurant Corporation v. Leal*, 892

S.W.2d 855, 858 (Tex. 1995); *James*, 21 S.W.3d at 561; *Kelley v. Pirtle*, 826 S.W.2d 653, 654-55 (Tex.App.–Texarkana 1992, writ denied).

Our review of the record convinces us that the trial judge could hardly have been more definite that he was rendering a full, final, and complete judgment disposing of the issues before him at the time he made his pronouncement. Accordingly, the entry of the written judgment was merely a ministerial act, and appellant's refusal to sign that memorialization did not affect its validity. Appellant's first issue does not reveal reversible error and is overruled.

The disposition which we have made of appellant's first issue requires us to consider her second issue. As we have noted, in that issue, she posits that she was induced to enter into the settlement agreement because of appellee's misrepresentations about the value of divided property which, she asserts, amounted to extrinsic fraud and requires that "a trier of fact should determine the falsity of the statements, [and] this case should be remanded for a new trial." Specifically, she says appellee misrepresented the value of the Corsica.

The elements of common-law fraud are that: 1) a material representation was made; 2) the representation was false; 3) when the representation was made, the person making the representation knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; 4) the representation was made with the intention that it be acted upon by the other party; 5) the party acted in reliance upon the

representation; and 6) the party suffered injury. *Johnson & Higgins of Tx., Inc. v. Kenneco Energy Inc.,* 962 S.W.2d 507, 524 (Tex. 1998).

In *Montgomery v. Kennedy,* 669 S.W.2d 309 (Tex. 1984), the court had occasion to define in some detail the differences between extrinsic and intrinsic fraud. In doing so, it explicated that:

> . . . [e]xtrinsic fraud is that fraud which denies a losing litigant the opportunity to fully litigate his rights or defenses upon trial. Extrinsic fraud is "collateral" fraud in the sense that it must be collateral to the matter actually tried and not something which was actually or potentially in issue in the trial. Extrinsic fraud is conduct that prevents a real trial upon the issues involved. Intrinsic fraud, on the other hand, is inherent in the matter considered and determined in the trial "where the fraudulent acts pertain to an issue involved in the original action, or where the acts constituting the fraud were, or could have been litigated therein."

*Id*. at 312-13.

In contending that she is entitled to a new trial on the question of whether appellee committed extrinsic fraud, appellant places primary reliance upon *McFarland v. Reynolds*, 513 S.W.2d 620 (Tex.Civ.App.–Corpus Christi 1974, no writ). That reliance deserves a discussion of that case. In that cause, the husband had induced his wife to consent to a divorce and property settlement upon the representation that the only way the parties could reconcile would be for the wife to permit a judgment to be entered that would grant her the divorce but would give him the custody of the minor children and award him all of the community property. *Id*. at 624. He further represented to her that he would remarry

8

her within two weeks, that "it would be the same as they had agreed upon before," that she would not have to move from their home and, as a result of their remarriage, she would continue to own the same interest in their community property as she did before and that she did not have any interest in the community property then owned by them because the debts exceeded the assets. *Id*. at 624. A divided court determined that these representations, including those as to the nature and extent of the community estate, "must be treated as a species of extrinsic fraud." *Id*. at 625.

A refusal to grant a new trial is tested by the abuse of discretion standard, and an appellate court should only reverse a trial court for abuse of discretion when a search of the record makes it clear that the trial court's decision was arbitrary and unreasonable. *Simon v. York Crane & Rigging Co., Inc.*, 739 S.W.2d 793, 795 (Tex. 1987); *Jackson v. Van Winkle*, 660 S.W.2d 807, 808-09 (Tex. 1983); *Wright v. Wright*, 867 S.W.2d 807, 810 (Tex.App.–El Paso 1993, writ denied).

The misrepresentations made by the husband in the *McFarland* case were of a far different nature from those alleged in this case. After considering the record as a whole, we cannot say that the trial court, who had the opportunity to see and observe the witnesses' demeanor on the witness stand, abused its discretion in determining that the testimony produced was not sufficient to show that appellee made misrepresentations of a nature sufficient to deny appellant the opportunity to litigate her rights at the trial of this case. Appellant's second issue is overruled.

In sum, both of appellant's issues are overruled, and the judgment of the trial court is affirmed.

John T. Boyd
Chief Justice

Do not publish.